■ JANET M. JOHNSON, Respondent, v ALLAN M. CHAPIN, Appellant. [854 NYS2d 18]—

The parties, both attorneys, were married in January 1991. In October of the same year, they had a son. The husband was the father of four children by a prior marriage, which ended in divorce in 1990. The wife, who had graduated from law school in 1979, worked as an associate at a large New York City law firm for six years. She then left private practice and began to work in house at the Walt Disney Company (Disney). In 1991, when she married the husband, she was the corporate vice-president in the motion picture and television department of Disney. Her salary in that position was $220,000 per year. The wife stopped working outside the home when the parties' son was three years old.

At the time of their marriage, the husband was a partner at another major New York City law firm, where he remained until the end of 1999. He then left the practice of law and became a managing director at Lazard Freres & Company, where he earned an annual average salary of $2.1 million over the approximately 11 years that the parties were married. Throughout the marriage, the husband also served on the Board of Directors of a number of publicly traded companies, from which he obtained additional income.

The parties lived an affluent life together that included fine dining, shopping at upscale stores, taking lavish vacations, employing household help, and sending their son to private school. They purchased a 3,700 square foot opulent cooperative apartment on Fifth Avenue between 94th and 95th Streets in

Manhattan. At the time of trial, the apartment was worth between $10 and $12 million.

Before the marriage, the husband owned a small home and a tenant house on approximately 160 acres of land in Claverack, New York. During the marriage, the parties invested close to $2 million to remodel the house and make substantial improvements on the surrounding property. The house was expanded, and was fitted with a new large kitchen with indoor and outdoor cooking facilities, a two-story living room, a darkroom, a hot tub, a sauna and a wine cellar. A tennis court and a pond were also built into the property.

The parties agree that the husband played a larger role in the conceptualization and oversight of the Claverack improvements. However, the couple brought their son to Claverack for many weekends and holidays while the renovation was being completed, and, while at Claverack and taking care of the parties' son, the wife participated in some of the project's details, and provided food for the workers as well as the family. For example, she testified that she "order[ed] pizza and ma[de] coffee for the guys who were working" on the restoration. The wife also stated that she personally designed the entire interior of one of the new structures on the property, and that she matched the kitchen tiling to the plants that she grew in her organic vegetable garden on the property. She also related that much of the parties' weekend and vacation time was spent in Claverack and devoted to "going over plans or bills or budget or proposals or finished work for various workmen." The renovation project spanned virtually the entire 11-year period that the parties were married.

At some point after the wife left Disney, the husband's travel schedule changed. It allegedly required him to work longer hours and travel internationally more frequently, leaving plaintiff as sole parent in charge of raising the parties' son. Sometime in 2001, the husband began an affair with a woman he met while traveling. In November of the same year, the wife commenced this action for divorce. In response, the husband immediately cut off her financial support. The wife specifically alleges that the husband hid the family car, and "launched an insidious campaign to alienate [the parties' son] from his mother." She claims that the husband committed adultery and that his treatment of her was cruel and inhuman. Her complaint demands a divorce judgment, equitable distribution of the parties' marital property, title to her separate property, custody of the parties' child, exclusive occupancy of the marital apartment, maintenance and child support.

In December of 2001, one month after the wife commenced this action, the husband left his position with Lazard Freres. Soon thereafter, he began working at Compass Advisors, a boutique investment bank and venture capital firm. The record and the transcript from the trial, which took place between 2003 and 2004, reflect that when defendant joined Compass, its "Deal Log" listed $97 million of deals at various stages of completion. The parties dispute whether Compass will be retained on all of the deals in the Deal Log, as well as Compass's future. However, at the time of trial, the husband was promised an annual base salary at Compass of $200,000 with a quarterly draw of $100,000. The terms of his employment also included an equity interest in the company, various related bonuses, and other investment opportunities. While Compass's CFO testified that as of 2003 the Compass partners had not yet received their quarterly draws, she also testified that the company's performance improved substantially between 2001 and 2003, the last year for which the parties had evidence. It remains the wife's position that the husband anticipated "paper losses" in the early years at Compass which would be "handsomely rewarded" as deals matured and business grew. Compass's CFO gave testimony which supported this position. For example, Compass's CFO testified that the company's retainers in 2003 were $5,057,837 (items the firm had been contracted for), 10 times its retainers for 2001. She also stated that from 2001 to 2003, the company's revenue grew from approximately $2 million to $11.8 million, that it expanded its offices and hired additional staff.

In 2002, prior to the trial, the wife made an application for interim relief. In response, the husband insisted that he could not afford to pay the amount requested. He alleged that he was not earning much and had no future expectation of making the millions of dollars he had earned during the marriage.

The court recognized the husband's deception and nondisclosure of assets, and imputed an average annual income to him of $2,273,680. In an order entered May 16, 2002, the IAS court awarded the wife $18,465 per month in pendente lite maintenance. The court also ordered the husband to pay $10,625 per month in child support beginning June 1, 2002, plus the costs of private schooling, tutors, summer camp, extracurricular and recreational activities and transportation expenses. It found the husband responsible for "all medical, dental and other health-related insurance coverage on behalf of [the wife] and the child" as well as "all unreimbursed, non-discretionary medical, dental, pharmaceutical, optical, [and] psychotherapy expenses for [the

wife] and the child." The husband was also required to pay for all household expenses for the marital residence. This included responsibility for all outstanding and ongoing carrying charges, utility bills, upkeep and maintenance of the marital residence and expenses attributable to household help. Further, the husband was ordered to pay the wife's counsel fees of $100,000. The husband appealed. This Court affirmed, stating: "[T]he motion court, when confronted with [the husband's] apparently *self-created unemployment and questionable claim of limited future earnings*, was warranted in imputing income to him on the basis of his past earnings and earning capacity" (299 AD2d 294, 295 [2002] [emphasis supplied]). In a stipulation which was "so-ordered" and entered October 16, 2003, the parties resolved all issues of custody and visitation.

The husband failed to pay the sums as ordered and built up arrears totaling more than $200,000. As a result, the wife was forced to move for an order enjoining the husband from transferring or spending money for any purpose other than to satisfy his outstanding support obligations. The husband cross-moved for a downward modification of the maintenance and child support awards and cancellation of his support and maintenance arrears. The IAS court denied the husband's application and set the arrears owed at $207,857.74 plus interest. It also directed that the husband not transfer certain funds out of his IRA accounts, and it restrained the husband from dissipating the parties' 2000 tax refund, which had an estimated value of $510,000.

The court noted concrete evidence showing that, in fact, for the prior five years, the husband had an average income of approximately $3 million a year, that he was receiving revenue "from numerous corporations . . . , and [was] a partner in a very active rising investment banking company." It found the husband's "allegations of poverty to be spurious," noting that he spent approximately $63,000 a month on himself. It also stated: "I find [the husband's] argument that his earning position has greatly changed since September 11, 2001 to be correct. *His economic position now is much, much better than it was in 2001.* The [husband] has not demonstrated that he has suffered a substantial change in circumstance, financial hardship, loss of income, or loss of earning capacity. *If anything, his income has increased*" (emphasis supplied). The husband appealed. His appeal was dismissed for lack of prosecution.

The parties were unable to settle their differences and a trial of all remaining financial issues ensued. This took place over approximately 14 days between October 2003 and April 2004.

Nine witnesses testified and hundreds of documents were introduced. The court found the testimony of the wife, and her witnesses, to be credible. By contrast, the court did not credit the testimony of the husband, or his witnesses.

In a careful and detailed decision after trial, the court reviewed the parties' marital history and enumerated the factors to be considered in an equitable distribution of marital property pursuant to Domestic Relations Law § 236 (B) (5) (d). The court expressed continued frustration at the fact that the husband had "stonewalled" and erected numerous obstacles to the full discovery of his income and assets. It stated: "The defendant posed every obstacle imaginable to prevent a fair and orderly discovery of his income and assets. Just as he had stonewalled Justice Marjory Fields, hiding the five million dollars he had made in 2000, so too has he stonewalled this court. In a downward modification application to this court he falsely claimed that he earned 1 million dollars less than he actually received in 2001. In addition to his salary, the defendant has been or is a director for a few very large publicly traded companies, both foreign and domestic, from which he has earned substantial additional income."

The court recognized that the parties had substantial assets, primarily in real estate. It concluded that at the commencement of the marriage, the husband had over $4 million in assets and the wife had $958,463. The husband had argued that he could no longer afford to support his wife and child in the manner to which they were accustomed. However, the court cited evidence that, despite his protestations of poverty, the husband continued to live a luxurious lifestyle, and that he spent approximately $63,000 a month for his own needs and that of his paramour. This evidence included invoices or other records of transatlantic trips on the Concorde, the purchase of fine jewelry and expensive clothing, and the maintenance of five residences (in New York and Paris). The court also noted the husband's "severe lapses in memory" when questioned about the thousands of dollars of marital funds spent on his paramour.

The court found that other than their real estate investments, the parties' cash and investment accounts represented the most significant component of the marital property. These the court correctly deemed active assets, and it determined their value as of the date of the commencement of the action. By contrast, the real estate holdings were deemed passive assets, which were valued as of the date of trial.

The court itemized seven of the parties' cash and investment accounts, and determined that their cumulative value as of the

date of the commencement of the action was $1,925,054. It determined that the husband and wife were each entitled to 50% of this amount, or $962,527. Only one of the accounts, worth $38,793, was in the wife's name, and the court found that the husband had depleted substantial funds in all of the other accounts. Thus, the court directed that $923,734 owed to the wife was to be paid from the distribution of the remaining accounts, or credited to the wife from the husband's share of the proceeds of the sale of the Fifth Avenue residence.

The court held that the Claverack estate was the husband's separate property. It concluded that the main house and land were worth $556,000 as of the date of the parties' marriage, and the tenant house $357,000. Accepting the valuation of the wife's expert, the court determined that at the time of trial, the value of the main house and property was $1,985,000, and the tenant house $516,000. The court held that the extensive renovations primarily accounted for the vast increase in value. Therefore, it held that the funds spent on the renovations were 100% marital property subject to equitable distribution. Because the court awarded 50% of the appreciation of the Claverack estate to the wife, it reduced the award for sums paid for improvements by the appreciated value of the property.

The court also reduced the husband's separate property by $1,282,138. This was the amount of marital property the husband used to pay his separate, premarital debt to his first wife. Thus, the court ordered that the wife be credited with 50% of $1,282,138, or $641,069.

The court determined that because the wife had not worked outside the home for nine years, she could not reestablish her legal career. It also concluded that it would take at least six years for her to develop her career in photography. The court thus awarded the wife durational maintenance of $6,000 per month for six years.

Finally, the court noted that the wife and her son "have suffered day to day crises resulting from the [husband's] harassment of them" with respect to every aspect of this protracted litigation. It thus awarded the wife legal fees and expert fees to be determined by a referee.

A detailed divorce judgment was entered on May 17, 2005. A hearing before a referee was held, and the court set the award at $800,000 for the wife's counsel fees, and $85,000 for her expert fees.

The husband appeals from the judgment of divorce and the fee award. He contends that the court erred in making a distributive award to the wife for 50% of the cost of improvements

to the Claverack property. He also asserts that the court grossly overvalued that property. The husband also claims it was error for the court to have compensated the wife for his payment of his premarital obligations, and he challenges the award of $885,000 in counsel and expert fees. In reply, the husband seeks a credit for his pendente lite support obligations in the distributive award.

The Domestic Relations Law contemplates an equitable division of assets based upon the parties' respective contributions to the marriage (*see* Domestic Relations Law § 236 [B] [5] [d] [6]). The distribution of the assets depends not only on the financial contributions of the parties, "but also on a wide range of nonremunerated services to the joint enterprise, such as homemaking, raising children and providing the emotional and moral support necessary to sustain the other spouse in coping with the vicissitudes of life outside the home" (*Price v Price*, 69 NY2d 8, 14 [1986] [internal quotation marks omitted]).

Under the Domestic Relations Law, there are two categories of property: marital property and separate property. Upon divorce, marital property is subject to equitable distribution and separate property is not (Domestic Relations Law § 236 [B] [1] [c], [d]). The statute defines marital property broadly as "all property acquired by either or both spouses during the marriage" (Domestic Relations Law § 236 [B] [1] [c]). The income of both spouses throughout the marriage is considered part of the marital estate and is utilized to calculate an equitable distributive award (Domestic Relations Law § 236 [B] [5] [d] [1]). By contrast, separate property, which is not subject to equitable distribution, is explicitly defined as property excepted from the marital estate. It is "property acquired before marriage or property acquired by bequest, devise, or descent, or gift from a party other than the spouse" (Domestic Relations Law § 236 [B] [1] [d] [1]). Separate property also includes "property acquired in exchange for or the increase in value of separate property, except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse" (Domestic Relations Law § 236 [B] [1] [d] [3]). The concept of separate property is interpreted narrowly (*see Hartog v Hartog*, 85 NY2d 36, 48 [1995]), and there is a presumption that property is marital until one of the parties proves otherwise (*LeRoy v LeRoy*, 274 AD2d 362 [2000]).

The court took testimony from a number of witnesses and considered the valuations of the parties' experts. It then made a detailed itemization of the parties' property and a detailed distributive award. The court properly considered the factors set

forth in Domestic Relations Law § 236 (B) (5) (d), including the parties' respective contributions to the family economic enterprise (*see Price*, 69 NY2d at 14-15; *O'Brien v O'Brien*, 66 NY2d 576, 587 [1985]).

The court determined that on the date of marriage, the value of the Claverack main house and land was $556,000 and the tenant house was worth $357,000. The husband was properly credited these amounts as separate property. The court then determined that on the date of trial the main house and property were worth $1,985,000 and the tenant house $516,000. These values were based upon the court's acceptance of the wife's expert's appraisals. This was proper given the record evidence that the wife's expert was far more experienced in making the type of appraisals necessary here. Further, the wife's expert's report was full and accurate, while husband's expert's report was replete with errors and omissions (*see Cash-Scher v Scher*, 299 AD2d 193, 193 [2002]; *Charland v Charland*, 267 AD2d 698, 700-701 [1999]).

The court appropriately held that extensive renovations accounted for the vast increase in value and that all improvements were 100% marital. Evidence in the record reveals that the Claverack property, as renovated, bears little resemblance to the former modest country house possessed by the husband when he entered into the marriage. Virtually all of the structures on the land, and the property itself, have been transformed. In awarding the wife half of the property's appreciated value, the court considered both the wife's work implementing the renovations as well as the fact that the improvements were paid for with marital funds (*see Price*, 69 NY2d at 11 [where separate property appreciates "due in part" to efforts of nontitled spouse as parent and homemaker, amount of appreciation is marital property subject to equitable distribution]). The Court of Appeals in *Price* held that where the nonmonied spouse contributes to the appreciation of the separate property of his or her spouse (through either direct efforts, or by taking care of domestic responsibilities while renovation is in process), he or she is entitled to an equitable share of the value of the appreciation.

The Domestic Relations Law considers spouses as participants in a family economic enterprise. Here, both spouses spent a large amount of time and money refurbishing the country house in Claverack. The wife spent many weekends and vacations with her husband and son in Claverack, and she contributed to the renovation of the property.

However, the court's award to the wife of 50% of the apprecia-

tion of the Claverack property was disproportionate (*see Ritz v Ritz*, 21 AD3d 267 [2005]). Market forces over the approximately 11 years of marriage accounted for some of the property's increased value. The wife was not entitled to a credit for any portion of this "passive" appreciation. Thus, a 75%/25% division of the appreciation of Claverack is a more equitable apportionment in the circumstances.

However, a point in the dissent on this issue requires response. The dissent states that because the wife "had nothing to do with the roof replacement [on the tenant house at Claverack]," the "active" appreciation of that structure on the property, largely attributable to the new roof, remains separate property. This analysis is in direct conflict with the Court of Appeals' holding in *Price* (*supra*). The Court in *Price* instructed that: "where separate property of one spouse has appreciated during the marriage and before execution of a separation agreement or commencement of a matrimonial proceeding and where such appreciation was 'due in part' to the contributions or efforts of the nontitled spouse as parent and homemaker, the amount of that appreciation should be added to the sum of marital property for equitable distribution (§ 236 [B] [5]). Whether assistance of a nontitled spouse, when indirect, can be said to have contributed 'in part' to the appreciation of an asset depends primarily upon the nature of the asset and whether its appreciation was due in some measure to the time and efforts of the titled spouse. If such efforts, . . . were aided and the time devoted to the enterprise made possible, at least in part, by the indirect contributions of the nontitled spouse, the appreciation should, to the extent it was produced by efforts of the titled spouse, be considered a product of the marital partnership and hence, marital property" (69 NY2d at 17-18). The record is plain that the entire renovation, including the work on the tenant house, took place "due in part" to the direct and indirect efforts of both spouses, including the wife's assistance at Claverack, either caring for the parties' son, cooking, providing meals to the workers, or otherwise contributing time and energy to a project which spanned the entirety of the parties' marriage. It cannot be determined, as a matter of law, on this record, that the wife was not at all involved in the renovation. Accordingly, under the Court's reasoning in *Price*, there is no basis for determining that the "active" appreciation of that structure was not subject to equitable distribution.

Because the appreciated value of the Claverack property was less than the near $2 million expended on the improvements, the court credited the wife with 50% of the difference between the amount expended and the appreciated value. This was error.

The product of the parties' efforts, which including the $1.9 million investment and substantial time and work, was the appreciated value of the Claverack property. The wife does not contend that the Claverack improvements were a unilateral "dissipation of assets" on the part of the husband. The couple shared the risk that the property's appreciation would not equal their investment, and there is no basis in law or equity to now shield the wife from the economic consequences of a shared decision to renovate the Claverack property.

The dissent reaches this same result, for different reasons. First, it states that the $1.9 million dollars the parties decided to invest in Claverack, income earned by the husband during the marriage, was not "marital property" because this action had not yet been commenced. It then draws an analogy between the sums spent on the improvements and hypothetical expenditures by a husband or wife on "designer clothing" or "season tickets to sporting events." However, the $1.9 million renovation expenditure bears no useful analogy to one spouse's expensive hobby. This was a joint investment in a renovation project that resulted in substantial appreciation of the husband's separate property.

The court also properly reduced the value of the husband's separate property due to his payment of $1,282,138 in after-tax marital funds to pay his separate obligations to his first wife: $584,136 in maintenance and $698,002 in a prior equitable distribution award. These reductions were deemed to increase the wife's distributive award by $641,069, also to be recouped from the husband's share of the proceeds of the sale of the Fifth Avenue apartment.

There is ample authority for the proposition that contribution to the separate assets and liabilities of a former spouse may be recouped in an award of equitable distribution. For example, in *Lewis v Lewis* (6 AD3d 837 [2004]) the Third Department upheld an equitable distribution award which allowed a plaintiff to recoup 50% of payments made during the marriage to reduce mortgage indebtedness on a residence deemed to be the defendant's separate property. Citing numerous cases, the Court emphatically reaffirmed the settled principle that: " 'marital funds should not be used to pay off separate liabilities' and, whenever that occurs, the inequity may be remedied by permitting the injured spouse to recoup his or her equitable share of the marital funds so used (*Micha v Micha*, 213 AD2d 956, 957 [1995]; *see Carr v Carr*, 291 AD2d 672, 676 [2002]; *Alessi v Alessi*, 289 AD2d 782, 783 [2001]; *Burgio v Burgio*, 278 AD2d 767, 769 [2000]; *Markopoulos v Markopoulos*, 274 AD2d 457,

458-459 [2000]; *Carney v Carney*, 202 AD2d 907, 908 [1994])"
(6 AD3d at 839). Similarly, in *Dewell v Dewell* (288 AD2d 252
[2001]), the Second Department held that the plaintiff was
entitled to recoup 50% of marital funds used to reduce a debt
incurred to obtain a medical license which, in the circumstances
of that case, was found to constitute the defendant's separate
property. Applying this authority, the court properly held that
plaintiff was entitled to recoup 50% of marital funds used to
meet the husband's separate legal obligations to his former
wife.

*Kohl v Kohl* (24 AD3d 219 [2005]), cited by the dissent, is dis-
tinguishable on the facts. That case involved the treatment of
the value of gifts to a former wife and children, not a legally en-
forceable debt. There is no conflict between our finding that the
husband's separate premarital debt need not be shared by the
wife, and the *Kohl* court's conclusion that gifts to a former
spouse were not a "wasteful dissipation of marital assets." (*Id.*
at 220.)

The essence of what the dissent characterizes as a "remar-
riage penalty" is the lot of any individual who enters into a
marriage with outstanding debt. That this husband's debt
stemmed from a former marriage does not distinguish it from
educational debt, credit card debt, or any other separate
financial obligation.

The dissent criticizes this reasoning, posing a hypothetical to
support the conclusion that our position "proves far too much."
One of the hypothetical spouses, W, has $100,000 in educational
debt (or medical debt or a judgment) incurred prior to the mar-
riage, which the couple repays in full from W's earnings during
the marriage. The dissent objects to a finding that H should be
entitled to 50% of the marital funds used to satisfy W's debt.
However, this was the holding in *Dewell v Dewell* (288 AD2d
252 [2001], *supra*). The decision states: "Before the marriage,
the defendant had incurred significant debt as a result of his
having attended medical school. Despite having a separate and
substantial stock and bond portfolio, he used marital funds to
pay off $203,155.83 worth of debt. Under the circumstances of
this case, the plaintiff is entitled to an award in the amount of
50% of the marital funds that were used to reduce the defen-
dant's debt incurred to acquire his medical license, which con-
stitutes separate property (*see, Markopoulos v Markopoulos*, 274
AD2d 457; *Micha v Micha*, 213 AD2d 956)."

The dissent portends that "the remarriage penalty" repre-
sents bad public policy because it will improperly inject financial
forecasting into decisions to divorce. This fear, as well as the

dissent's musings as to treatment of legally unenforceable moral obligations on distributive awards, are not pertinent to the distribution of these parties' assets under the governing law. The fact that the maintenance obligation was incurred incident to a divorce which allowed this couple to enter into a legally enforceable marriage is similarly immaterial. Applying settled precedent to the facts of this case, the wife was entitled to recoup her share of marital property used to pay the husband's separate debt as part of her distributive award (*Lewis, supra*; *Dewell, supra*).

The husband argues that the judgment inequitably directs that he pay $2,833 in monthly child support (plus the costs of school, medical bills, and other itemized necessities) and $6,000 per month for six years in durational maintenance. He also seeks an equitable distribution credit for an alleged overpayment of pendente lite support. However, the court's durational maintenance award was not an abuse of discretion. The wife was 51 years old at the time of the commencement of this action. She had been out of the work force for nine years, during which time she had primary responsibility for raising the parties' child. As such, it was both fair and realistic for the court to have concluded that since it would take at least six years for the wife to develop a career in photography, a six-year maintenance award of $6,000 a month would provide her with appropriate assistance in reaching her vocational goals and allowing her to become self-sufficient (*see Atweh v Hashem*, 284 AD2d 216, 217 [2001]; *Kaplan v Kaplan*, 21 AD3d 993, 996 [2005]).

However, equity requires that the husband be awarded a distributive credit for $548,460, the amount that his pendente lite support payments exceeded what he would have been required to pay consistent with the final maintenance award (*Galvano v Galvano*, 303 AD2d 206 [2003]; *Gad v Gad*, 283 AD2d 200 [2001]). It also requires that the husband be credited $484,370.50, 50% of the $968,741 in mortgage and maintenance payments made for the marital residence during the pendency of the divorce action (*Pickard v Pickard*, 33 AD3d 202, 205 [2006], *appeal dismissed* 7 NY3d 897 [2006]).

It is the dissent's position that the husband's maintenance, child support and additional court-ordered financial obligations are excessive "in light of the husband's actual earned income of $330,000." The $330,000 figure for the husband's present income is derived from the husband's assertion, at trial, and on appeal, that he receives a $200,000 salary at Compass and $130,000 in fees for serving on various boards. However, the husband has consistently not been forthcoming regarding his

income. The husband has been found incredible in his reporting of his income and assets by the motion court ruling on the pendente lite support order, by the court reviewing the application for a downward modification of support, and by this Court on a prior appeal. Thereafter, the court which presided over the trial and rendered the judgment appealed expressly found that the husband posed "every obstacle imaginable" to discovery of his actual income and assets.* It cited a false statement to the court regarding $1 million in income for 2001, and the husband's general history of under-reporting his income and hiding his assets. The court also noted that the husband's claims regarding maintenance and support obligations are inconsistent with the documented $63,000 a month that he was spending on himself and his girlfriend. Over a year this would amount to $756,000, which is more than double the husband's $330,000 stated gross income. Because the husband has provided no objective basis for overturning the court's evaluation of his credibility on the issue of his income and assets, we see no basis for modifying the final maintenance and support awards.

Finally, the court's award of counsel fees and expert fees was appropriate. Under Domestic Relations Law § 237 (a), a court in a divorce action may award counsel fees to a spouse "to enable that spouse to carry on or defend the action or proceeding as, in the court's discretion, justice requires, having regard to the circumstances of the case and of the respective parties." Interpreting this section, the Court of Appeals has held that: "in exercising its discretionary power to award counsel fees, a court should review the financial circumstances of both parties together with all the other circumstances of the case, which may include the relative merit of the parties' positions" (*DeCabrera v Cabrera-Rosete*, 70 NY2d 879, 881-882 [1987]).

Despite the husband's protestations to the contrary, an objective view of the record, including his imputed future earnings, shows that he is in a superior financial position. Further, the husband has engaged in a pattern of obstructionist conduct which unnecessarily delayed and increased the legal fees incurred in the litigation (*see Cooper v Cooper*, 32 AD3d 376 [2006]; *De Bernardo v De Bernardo*, 180 AD2d 500, 502 [1992]). Accordingly, the husband was properly ordered to pay the wife's legal fees.

---

* The decision underlying the divorce judgment was issued after the husband began his work at Compass Advisors. In addition, the court's conclusions about the husband's efforts to frustrate discovery of his actual income were made notwithstanding the fact that it expressly credited the testimony of the CFO of Compass Advisors.

Further, given that the wife was required to hire an expert to counter the husband's facially inaccurate valuation of the appreciation of the Claverack property, the court properly granted the wife an award for her expert's fees (*Polychronopoulos v Polychronopoulos*, 226 AD2d 354 [1996]).

We have considered the husband's other arguments and find them unavailing. Concur—Tom, J.P., Mazzarelli and Buckley, JJ.

Friedman and McGuire, JJ., concur in part and dissent in part in a memorandum by McGuire, J., as follows: The majority is correct that the judgment of divorce and money judgment should be modified so as to vacate those portions of the distributive award to the wife representing (1) 50% of the amount by which the total of the expenditures during the marriage on improvements to the Claverack property exceeded the appreciation of the property, and (2) 50% of the appreciation of the Claverack property over the course of the marriage. The majority is also correct that the wife should be awarded 25% of the appreciation of the Claverack property over the course of the marriage, and the husband should be awarded credits against the distributive award in the amounts of (1) $548,460, representing the amount of the excess of the pendente lite maintenance award over the final maintenance award, and (2) $484,370.50, representing 50% of the amounts he spent during the pendency of the divorce action on the marital apartment (i.e., the Fifth Avenue cooperative).

I write separately with respect to these conclusions in part because my reasoning differs somewhat from the majority, but also because I believe the facts supporting certain of the conclusions should be stated in more detail. In addition, I believe that certain arguments by the parties that the majority does not address should be addressed. However, with respect to two other issues—Supreme Court's unprecedented award to the wife of more than $640,000, representing 50% of all the maintenance, child support and equitable distribution payments the husband made during the marriage to his first wife (in accordance with his legal obligations to his first wife and their children), and the husband's annual income as a partner of Compass Advisors—I respectfully disagree with virtually everything the majority has to say.

With respect to the Claverack property, which was the husband's premarital property, Supreme Court did not err in accepting the valuation of the wife's expert (*Cash-Scher v Scher*, 299 AD2d 193, 193 [2002]). Supreme Court did err, however, in two respects relating to the Claverack property. First, Supreme Court should not have included within the distributive award

an amount equal to 50% of the amount ($444,796) by which the total of the expenditures during the marriage on improvements to the Claverack property exceeded the appreciation of the property. Supreme Court viewed these expenditures as "marital property," but, as the husband correctly observes, "marital property" was not used to improve the Claverack property for the simple reason that no "marital property" existed until the commencement of this matrimonial action. As the Court of Appeals stated in *O'Brien v O'Brien* (66 NY2d 576, 583 [1985]), marital property " 'is a statutory creature, is of no meaning whatsoever during the normal course of a marriage and arises full-grown, like Athena, upon the signing of a separation agreement or the commencement of a matrimonial action' " (quoting Florescue, *"Market Value," Professional Licenses and Marital Property: A Dilemma in Search of a Horn*, 1982 NY St BA Fam L Rev 13 [Dec.]). As is undisputed, the husband's income was the source of the approximately $1.9 million expended on the Claverack property during the marriage.

That is not to say, however, that under no circumstances may a distributive award take into account payments made during the course of a marriage that reduce the separate indebtedness of one spouse or add to the value of one spouse's separate property. To the contrary, Domestic Relations Law § 236 (B) (5) (d) (13) expressly and broadly authorizes the trial court to take into account "any other factor which the court shall expressly find to be just and proper" in determining an equitable distribution of marital property. Thus, in *Carney v Carney* (202 AD2d 907, 908 [1994]), what were described as "marital funds"—proceeds of the postjudgment sale of the marital residence—were used to pay the separate liability of the husband, and the Third Department ruled that the wife was entitled to a credit of one half of the amount paid to satisfy the liability. In subsequently explaining that ruling, the Third Department stated that "[a]uthority for that resolution can be found in the traditional notion that equity will intervene to remedy one spouse's breach of fiduciary responsibility or unjust enrichment by virtue of his or her expenditure of marital funds" (*Micha v Micha*, 213 AD2d 956, 957 [1995]).

The funds expended by the husband to improve the Claverack property, however, certainly did not entail any unilateral breach of his obligations to the wife. Indeed, there is no evidence that the wife ever protested these expenditures by the husband, and she has never claimed that she did. At least some portion of the expenditures, moreover, was made for her benefit. Nor, given that the husband was the source of the funds expended on the

Claverack property, can this component of the distributive award be justified as necessary or appropriate to remedy the unjust enrichment of the husband. The implications of Supreme Court's approach are even less defensible. Under that approach, a spouse who uses his or her own income or assets during the marriage and makes what turns out to be poor or less than wholly successful investment decisions (or who has expensive hobbies) could face significant and potentially ruinous liability to his or her spouse if the marriage eventually dissolves.

I do not mean to suggest that the absence of liability should turn solely on whether the funds expended can be sufficiently linked to the income or assets of the spouse who expends the funds. Marriage, of course, is an "economic partnership" (*see Price v Price*, 69 NY2d 8, 14-16 [1986]). Accordingly, regardless of the extent to which the funds expended can be traced to one spouse or the other, a spouse who spends, with the knowledge of his or her partner, thousands of dollars annually on designer clothing or for season tickets to sporting events, should not have hanging over his or her head the prospect of having to pay to his or her partner one half of all the funds so expended in the event the marriage ultimately fails. At least in the absence of the kind of circumstances that support intervention by equity (*see Micha v Micha*, 213 AD2d at 957), the extent of the spending freedom of each marital partner is a matter for the partners and should not be policed on a retrospective basis by the courts upon the dissolution of a marriage.[1]

Second, Supreme Court erred in awarding the wife 50% of the appreciation of the Claverack property over the course of the marriage. Given that the marriage was not one of long duration, that the appreciation of the tenant house on the property was passive in nature (*Price*, 69 NY2d at 18 [passive appreciation of separate property, as a general rule, remains separate property]), that the funds expended to improve the property were the husband's and that his involvement in the renovations was far more extensive, an award of 25% of the appreciation is more appropriate (*see Ritz v Ritz*, 21 AD3d 267 [2005]).

---

1. The majority appears to disagree with my position, based on the language quoted above from *O'Brien* (66 NY2d at 583), that the $1.9 million expended on the Claverack property was not "marital property." The majority, however, neither discusses *O'Brien* nor offers any reason to conclude that these funds were "marital property." The majority does not and cannot dispute that the husband's income was the sole source of funding for the renovations. Curiously, the majority makes no mention of this uncontroverted fact in explaining its conclusion that a 75%-25% division of the appreciation "is a more equitable apportionment in the circumstances." Presumably, it nonetheless considers this fact to be of more than passing relevance.

With respect to the relative involvement of each spouse in the Claverack renovations, I note that the wife conceded that the renovations were "primarily [the husbands'] artistic vision [as] he has better artistic vision in that field than I do." The husband's testimony on the following points was undisputed: he acted as the general contractor for the renovations and thus he "supervised . . . and coordinated all of the people working on the project, from the people digging the foundations to the plumbers, to the electricians"; he paid for all the improvements out of his own income; although he "consulted her on various things, [he] was really responsible for the renovations." As for the tenant house, the trial evidence shows that with the exception of a new roof, only minor repairs and renovations were made to the house. The wife, moreover, had nothing to do with the roof replacement. Accordingly, any appreciation of the tenant house on account of the new roof should not be considered marital property (*Price*, 69 NY2d at 18 ["where the appreciation is not due, in any part, to the efforts of the titled spouse but to the efforts of others . . . the appreciation remains separate property"]).[2]

The husband should have received a credit against the distributive award of $548,460, representing the amount of the excess of the pendente lite maintenance award over the final maintenance award (*see Pickard v Pickard*, 33 AD3d 202 [2006], *appeal dismissed* 7 NY3d 897 [2006]; *Galvano v Galvano*, 303 AD2d 206 [2003]; *Gad v Gad*, 283 AD2d 200 [2001]). Contrary to the wife's contention, the husband is not barred from raising the issue of whether he should receive such a credit because of the dismissal for failure to prosecute of his appeal from an order of Supreme Court denying his motion for a downward modification of the pendente lite award. In the first place, the bar that can arise when an appeal is dismissed for want of prosecution is discretionary (*see Rubeo v National Grange Mut. Ins. Co.*, 93 NY2d 750, 756 [1999]). In any event, because a final award had not been made the husband could not have raised the issue of a credit against a final award on that prior appeal (*see Ruffing v Union Carbide Corp.*, 1 AD3d 339, 340 [2003]). In the absence of any evidence that the pendente lite child support payments were not spent on the parties' child, I would reject

---

**2.** In disputing this point, the majority overlooks the testimony that the tenant house was across a road from the main house and the other structures (and grounds) that were the subject of the extensive renovations. Moreover, there is no testimony from the wife or anyone else that she had anything to do with, as she put it, the "minor repairs and renovations" to the tenant house. Finally, it was undisputed at trial that some of the renovations to the tenant house occurred prior to the marriage.

the husband's contention that he also should receive an additional credit of $342,848, the amount by which the pendente lite child support award exceeded the final child support award.[3]

Our decision in *Pickard* (33 AD3d 202 [2006]) provides decisive support for another of the husband's claims of error. In that case we ruled that the husband should not have received a credit of 100% of the amounts he spent during the pendency of the divorce action on the marital apartment, a cooperative, for maintenance and insurance. Rather, "[s]ince these payments maintained the value of the marital residence and both parties benefitted from the sale of the residence, [the husband] should have received a 50% credit for these payments" (33 AD3d at 205). Here, the marital apartment, a Fifth Avenue cooperative, was awarded to both spouses and, during the pendency of the divorce action, the husband made mortgage and maintenance payments totaling $968,741. Although I would reject the husband's argument that he should receive a credit against the distributive award in the full amount of these payments, under *Pickard* he plainly is entitled to a 50% credit.

Supreme Court also erred in including within the distributive award the amount of $641,069, representing 50% of the amounts of maintenance, child support and equitable distribution paid by the husband during the marriage in accordance with his legal obligations to his first wife. As it is undisputed that the husband was the source of the more than $1.28 million that he paid to his first wife during the second marriage, this component of the distributive award was erroneous for essentially the same reasons Supreme Court erred in awarding 50% of the excess of the amounts expended to improve the Claverack property over its appreciation. As discussed below, moreover, this award represents bad public policy and is inconsistent with our recent decision in *Kohl v Kohl* (24 AD3d 219 [2005]).

In upholding this unprecedented award—the parties cite to no decision in which such an award was made or upheld—the majority breathes new irony into Samuel Johnson's famous definition of remarriage as the triumph of hope over experience. What the majority fails to appreciate is that it thus raises the spectre of a remarriage penalty that will loom over many second marriages. Remarriage will be discouraged in the first instance whenever the previously divorced spouse is under an obligation to make maintenance, child support or equitable distribution payments to his or her first spouse. The longer the second marriage lasts, the greater the potential financial penalty if it also

---

**3.** The majority also rejects this claim, albeit without stating its rationale for doing so.

ends in divorce. Even when it does not deter a second marriage, this remarriage penalty will encourage the remarried spouse to file for divorce sooner rather than later if the second marriage encounters difficulties. Under the circumstances presented in this case, moreover, the penalty inflicted on the spouse who must pay once again a substantial portion of all maintenance, child support and equitable distribution payments that he or she previously paid to a first spouse also represents a windfall to the recipient spouse.

Putting aside the fact that the majority's decision to uphold the award represents bad public policy and that the majority, unsurprisingly, cites not a single case in which such an award was made or upheld, the majority's decision cannot be reconciled with our recent decision in *Kohl* (*supra*). In *Kohl* we held as follows: "Nor was the money *given* by the husband to his former wife and children of that marriage a wasteful dissipation of marital assets. Such *gifts* were not unreasonable in relation to the husband's income and were consistent with the type of gift giving he had engaged in throughout his marriage to the wife" (24 AD3d at 219-220 [emphasis added]). The conflict is palpable. If a spouse is not on the hook upon the dissolution of a second marriage for 50% (or any portion) of the amount of payments made during the second marriage to a former spouse and the children of the earlier marriage that are *gratuitously* made but are not unreasonable in relation to the donor spouse's income, it makes no sense to conclude that a spouse is on the hook upon the dissolution of a second marriage for 50% of the amount of such payments when they are *required* by law to be made and also are not unreasonable in relation to the income of the spouse obligated to make the payments. No rational public policy could support a rule of law that thus favors the making of the gratuitous payment even as it discourages the making of the legally required payment.

The majority attempts to defend this award of more than $640,000 as "the lot of any individual who enters into a marriage with outstanding debt." According to the majority, the husband's obligations to his former wife and their children are indistinguishable from "educational debt, credit card debt, or any other separate financial obligation."

In the first place, however, the husband's obligations can and should be distinguished from "educational debt, credit card debt [and] other separate financial obligation[s]." The husband's obligations were essential components of the very judgment of divorce that permitted the second marriage lawfully to take place. Obviously, when a prospective spouse incurs any of these

other forms of debt, doing so does not enable him or her subsequently to enter into a legally valid marriage.

Moreover, the record establishes that the wife was aware, before marrying the husband, of the terms of his prior judgment of divorce. With the "good" of the husband's divorce judgment (i.e., the ability to marry the husband and the benefits, tangible and intangible, she realized over the course of their marriage), the wife took the "bad" (i.e., the husband's financial obligations to his former spouse and their children). Even putting aside that the risk the second marriage could end in divorce was, as the majority puts it in a similar context, one "[t]he couple shared," the majority's determination to uphold the award is clearly wrong. To bestow upon the spouse an award of 50% of the amounts paid by the husband in accordance with his legal obligations to his first wife and their children wrongly assumes that the wife received no compensating benefits as a result of the marriage she was able to enter into because of the prior judgment of divorce.[4] Clearly, the wife believed there were such benefits when she entered into the marriage with knowledge of the legal obligations imposed on the husband by that judgment of divorce.

A second flaw in the majority's reasoning is that it proves far too much. Suppose that when W and H marry, W has $100,000 in educational debt (or owes $100,000 to a hospital for uninsured emergency surgery or to a judgment creditor as a result of a business deal that soured), that during the first 5 or 10 years of their marriage W consistently earns significantly more income than H, and that during that period W's student loans (or the other debt) are repaid in full from W's earnings. Under the majority's reasoning, W must pay $50,000 to H if the marriage thereafter ends in divorce. That, after all, "is the lot of any individual who enters into a marriage with outstanding debt."

The absence of any limiting principle in the majority's reasoning prompts the following question: what is the majority's position with respect to "the lot of an individual" who enters

---

4. Of course, a different result might well be appropriate if the source of the funds used by the previously divorced spouse to satisfy, in whole or in part, his or her financial obligations to a former spouse is the income or separate assets of the second spouse. In such a case, equity might intervene to prevent unjust enrichment (*Micha*, 213 AD2d at 957). For this reason, my position is by no means inconsistent with the decision of the Second Department in *Dewell v Dewell* (288 AD2d 252 [2001]), a case upon which the majority relies. The opinion in *Dewell*, after all, does not indicate whether the income of the wife, the husband or both spouses was used to reduce the husband's separate debt.

into a marriage with what he or she regards as a moral obligation to a charitable organization? If that individual consistently earns significantly more income than his or her spouse and contributes $5,000 or $10,000 annually to the charity, does the majority believe that if the marriage ends in divorce the contributing spouse must pay to the other spouse 50% of all the contributions (on a pre- or post-tax basis)? Given the majority's contention that its decision to uphold the award is consistent with the holding in *Kohl*, neither a yes nor a no answer from the majority would make any sense.

For these reasons, I would vacate the award to the wife of 50% of all the maintenance, child support and equitable distribution payments made by the husband to his first wife during the parties' marriage.

The other issue I disagree with the majority about is the husband's earnings at Compass Advisors. Unfortunately, the majority's discussion of this issue and the history of this litigation on that issue is riddled with errors. To begin, although the majority states that the husband "left" his position with Lazard Freres, the uncontradicted testimony of the general counsel for Lazard was that senior management decided and communicated to the husband in the fall of 2001, "a time of great tumult for Lazard" when it was going through a restructuring, that the husband "should find other employment" and that he did not have the option of continuing as a member of Lazard. Thus, if the majority means to suggest that the husband voluntarily left Lazard and incurred a huge decrease in his earnings, there is no support in the trial record for that notion.

With respect to his salary at Compass Advisors and the director fees he receives, the majority asserts that the husband has been "found incredible" with respect to "his reporting of his income and assets by the motion court ruling on the pendente lite support order, by the court reviewing the application for a downward modification of support, and by this Court on a prior appeal." In key respects, this assertion is manifestly wrong. In fact, the motion court made no findings at all with respect to the husband's credibility on this or any other issue. The motion court did refer, however, to "some omissions by *both parties* in recent [financial] reporting" (emphasis added). Notably, a review of the motion court's decision and order reveals that it was decided before the husband had even begun working at Compass Advisors. Thus, the motion court could not possibly have made any findings on the husband's credibility regarding his earnings at Compass Advisors.

Relatedly, the majority also writes that the motion court

"imputed an average annual income to [the husband] of $2,273,680." But this reflects no finding that the husband voluntarily had reduced his income. Rather, it is also clear from the decision and order that the sole basis for the court's decision to impute that amount of income to the husband was that it reflected his average annual income from 1998 through 2001. The majority suggests otherwise. That is, it suggests that findings of wrongdoing by the husband were decisive in the motion court's imputation of $2,273,680 in annual income to the husband. Thus, it states that the motion court "recognized the husband's deception and nondisclosure of assets, and imputed an average annual income to him of $2,273,680." The motion court, however, made neither a finding nor even a reference to "deception" by the husband. With respect to nondisclosure of assets, as noted above, the motion court stated that there were "some omissions by both parties in recent reporting" and commented somewhat cryptically that "[h]iding" one of the cars they owned was "not appropriate behavior" by the husband.

Nor did this Court find the husband "incredible" on the issue of his "reporting of his income and assets" (or any other issue) when it affirmed the motion court's pendente lite award. Rather, this Court stated only that "the motion court, when confronted with [the husband's] apparently self-created unemployment and questionable claim of limited future earnings, was warranted in imputing income to him on the basis of his past earnings and earning capacity" (299 AD2d 294, 295 [2002]). Of course, this Court did not have before it the trial record. As noted above and as will also be discussed below, the trial record establishes that the husband's unemployment was not self-created and his future earnings did decline precipitously.

It is true, however, that when Supreme Court denied the husband's motion for a downward modification of the pendente lite child support and maintenance awards, it rejected the husband's contention that his income had drastically decreased. In doing so, Justice Stackhouse, who also presided at trial, did not purport to find the husband "incredible." It appears, moreover, that the motion was decided on the papers. As the majority stresses, Justice Stackhouse stated that the husband's " 'economic position now is much, much better than it was in 2001' " and that " '[i]f anything, his income has increased' " (emphasis added by majority).

But if these pretrial findings were refuted by the trial evidence, they would be irrelevant. The majority believes they were *substantiated* by the trial evidence. In this regard, it states that "the wife's position [is] that the husband anticipated 'paper

losses' in the early years at Compass which would be 'handsomely rewarded' as deals matured and business grew." The majority then asserts that the CFO of Compass Advisors "gave testimony which supported this position." As a review of the CFO's testimony makes clear, the CFO's testimony unequivocally supported the husband's position in every relevant respect.

The CFO, Lorraine Costelloe, testified, without contradiction by any other trial evidence, to the following: the husband's annual base salary was $200,000, and he thus received slightly more than $100,000 in 2002 (reflecting the fact that he began working at Compass Advisors in mid-2002) and $200,000 in 2003; neither the husband nor any other partner had ever received a bonus payment; the husband never received any quarterly draws; the salary payments in 2002 and 2003 were the only compensation he received from the firm; in September of 2002, he loaned the firm $120,000 (and other partners also loaned money) because of the firm's cash flow problems; in 2003, he loaned the firm about $29,000 (and other partners also loaned money) for the same reason; none of the loans by the husband have been repaid; in 2003, also for this reason, the firm stopped paying partners for six pay periods and the firm cut costs by, among other steps, reducing health insurance coverage and increasing co-pay requirements and deductibles and eliminating its life insurance plan; for a period of some months in 2003 the firm was in default with respect to interest payments owed to Commerzbank; the firm had an operating loss of just over $8,000,000 in 2001; the audited financial statement of the firm for 2002 (by KPMG) reflected an operating loss of $6,567,000; as Ms. Costelloe testified on January 4, 2004, an audited financial statement for 2003 had not been completed but the firm expected to break even due to a large fee of $3,000,000 that it had received in December; some $1,200,000 of that fee was used to pay bonuses to between 25 and 35 employees (not partners) of the firm.

With respect to Ms. Costelloe, the majority is correct only when it notes that she was among the trial witnesses who were found to be credible by Justice Stackhouse. The majority's assertion that Ms. Costelloe "gave testimony which supported [the wife's] position" is breathtakingly wrong. As is evident, just the opposite is true.[5] Not surprisingly, the majority offers

---

5. Just before its assertion that Ms. Costelloe's testimony "supported [the wife's erroneous] position," the majority writes that "[t]he record . . . reflect[s] that when defendant joined Compass, its 'Deal Log' listed $97 mil-

nothing by way of an attempt to respond to any of the points I make regarding its erroneous reliance on the CFO's testimony.[6]

The judgment of divorce requires the husband to pay to the wife: (a) taxable maintenance of $6,000 per month ($72,000 per year) for six years; (b) child support in the amount of $2,833 per month (approximately $34,000 per year); and (c) 100% of all additional costs for school tuition, inclusive of room and board, camp and medical expenses, an amount the husband asserts without contradiction to be approximately $40,000 per year. Whatever the precise tax rate for the husband would be, he clearly could not meet these obligations without gross annual income substantially in excess of the annual sum of these obligations (approximately $146,000), even considering that he can deduct the maintenance payments.

lion of deals at various stages of completion." This statement adopts the position asserted by the wife in her brief (and at trial) that "[w]hen [the husband] joined Compass Advisors, the firm boasted $97 million of deals in various stages of completion." Again, however, the record squarely contradicts this effort by the wife to portray Compass Advisors as a firm on the brink of achieving staggering profits. To be sure, at one point on cross-examination, Ms. Costelloe answered "Yes" to a question asking her with respect to the "Deal Log" whether "they [were] at various stages of completion." But this isolated snippet of testimony gives a misleading account of the "Deal Log." In fact, Ms. Costelloe testified, and no other trial evidence contradicted her, to the following: the "Deal Log" was prepared in the beginning of 2002; the firm had been retained on only three of the deals, earning $1,700,000 in fees; every other deal, listed under various categories, reflected "prospective clients," "prospects" or business the firm "hope[d] to get"; as of January 2004 the firm no longer maintained such a "Deal Log." Moreover, placing such a rosy spin on the "Deal Log" is at odds with the uncontradicted testimony of Ms. Costelloe that these prospective deals in the beginning of 2002 did not keep the firm from losing over $6.5 million in 2002 or from just breaking even in 2003. On this score, finally, two other points should be made. First, the majority's reliance on increases in the firm's gross revenues between 2001 and 2003 is ingenuous. Obviously, the majority should not wholly ignore the expense side of the ledger; nor, of course, should the majority ignore as well the actual results for 2002 and 2003. Second, the majority is misleading with its reference to Ms. Costelloe's testimony to the effect that from the end of 2001 to the end of 2003 the firm had a ten-fold increase in its retainers. As Ms. Costelloe also testified, the firm grew substantially during the same period by, among other things, opening a London office and increasing the number of employees. Again, the majority myopically focuses on only one side of the financial ledger. Furthermore, Ms. Costelloe's uncontradicted testimony regarding the actual results for 2002 and 2003 is surely of transcendent importance relative to the increase in its retainers.

6. The majority misleadingly states that Ms. Costelloe "testified that as of 2003 the Compass partners had not *yet* received their quarterly draws" (emphasis added). The word "yet" is entirely the majority's. Contrary to this effort to suggest that Ms. Costelloe testified that the partners were on the verge of receiving quarterly draws, Ms. Costelloe gave no such testimony.

In making these awards and this determination, Supreme Court inexplicably and erroneously concluded that at the time of trial the husband's annual income as a partner at Compass Advisors was $600,000 annually (a salary of $200,000 and quarterly draws of $100,000). As discussed above, the uncontradicted testimony of Ms. Costelloe established that the husband *never* received a quarterly draw and that the firm had *never* made profits that could be distributed to the partners. Even assuming that the future prospects of the firm are bright, the permanent maintenance and child support awards and the direction that the husband pay 100% of the additional costs are excessive in light of the husband's actual earned income of $330,000 annually (his salary at Compass Advisors plus the fees he received for serving as a director of certain entities).

Supreme Court, moreover, appears not to have considered or to have given insufficient consideration to the substantial investment income that the wife will be able to realize as a result of the equitable distribution to her of assets with a value in excess of $5 million (Domestic Relations Law § 236 [B] [6] [a] [1]; *Carman v Carman*, 22 AD3d 1004, 1006, 1009 [2005]; *Love v Love*, 250 AD2d 739, 740 [1998]). Nor did Supreme Court give adequate consideration to the wife's ability to resume her legal or business career. Rather, without any evidentiary support, Supreme Court simply dismissed as "unlikely" that the wife could reestablish any such career. Obviously, as a former associate at a major New York City law firm who rose to the position of vice-president of business affairs of a division of the Walt Disney Company, the wife is a person with considerable talents, intelligence and experience. Indeed, Justice Fields stated in her decision on the pendente lite motion that in 1995, when the wife last was employed, "she earned about $930,000 in salary and stock options at the Walt Disney Company."

As the majority stresses, Supreme Court found that during the pendency of the divorce action the husband was "spending approximately $63,000.00 a month for his own needs and those of his paramour." Even assuming the accuracy of this finding—it was and remains vigorously disputed by the husband—it does not follow that it reflects hidden income. To the contrary, it also is possible that, as the husband maintains, preexisting assets rather than current income were used to make pendente lite payments to the wife and to support himself. Of course, the extent of the husband's personal spending after the action was commenced might support a reasonable inference that he had undisclosed sources of income or expected his income to increase substantially in the near future. In making the permanent main-

tenance and support awards, however, Supreme Court did not purport to impute income to the husband on the basis of either inference. Nor did Supreme Court purport to find that existing assets were not the source of his spending. Rather, Supreme Court made the inexplicably wrong finding that "[a]t the time of trial [the husband] was earning a base salary of $200,000.00 annually and a quarterly draw of $100,000.00 which provided total annual earnings of $600,000.00."

The extent of the misconduct by the husband during the pendency of the action relating to his financial affairs is simply not a matter that is before this Court for decision.[7] Whatever the extent of that misconduct may be, the husband was entitled to have the permanent maintenance and child support awards computed on the basis of findings that are supported by the evidence. Supreme Court's finding concerning the husband's earnings at the time of trial, however, is manifestly wrong. The majority does not and cannot dispute this critical fact. Indeed, the majority ignores it.

Accordingly, I would remand for a new trial limited to the issues necessary to determine the appropriate amount of maintenance and child support (including the appropriate level of responsibility of the husband for the additional costs).[8]

---

**7.** I would note, however, that despite Justice Stackhouse's statement that the husband "stonewalled Justice Marjory Fields . . . [by] hiding the five million dollars he had made in 2000," Justice Fields made no such finding in her written decision. Rather, Justice Fields simply noted that although the husband's memorandum of law "states he 'was earning a substantial income as a partner' at the investment banking firm [Lazard], . . . there is no hint of his 2000 income in any of his papers." Surely, neither the husband nor his counsel thought that the obvious—the absence of any statement about his 2000 income—could be hidden. And, as the husband has argued, his motion in March of 2002 before Justice Fields for a reduction in the pendente lite payments was based on his income in 2002, after his employment at Lazard ended and before he began working at Compass Advisors.

**8.** The husband would be free to maintain that he should receive an additional credit against the distributive award to the extent the permanent maintenance and child support awards were reduced on remand. I would also make clear that the parties would be free to take whatever action they deemed appropriate in the event either or both of them believed a change in circumstances since the trial warranted a modification of the awards.